Good morning. We have Constance v. Brennan. Chancellor, you're up. Good morning, Your Honors. May it please the Court, I am Edward Kiyonko, and I represent Ed Brennan. Mike Constance, Judy Cates, and Ned Brennan practiced law together as equal shareholders for almost ten years until the firm broke up in 1997. Ed Brennan began representing Jimmy Connors in 1991 and represented him in a large variety of matters. In 1992, they signed a representation agreement in which Brennan's attorney's fee for past and future legal services was set at 20% of Connors' interest in the Jay Connors Group. That contract is the centerpiece of this case and of the 16-year odyssey that brings us here. In 1993, Connors exchanged his shares for 2.5 million shares of Argosy Gaming Company. During 1995 and 1996, as Connors sold some of his Argosy shares, he paid 20% of the proceeds to Brennan, and Brennan deposited them in the firm's account. Constance and Cates received their share of these fees, which totaled well over a million dollars. As of January 1997, Connors still owned some 2,291,000 Argosy shares, but despite repeated demands, he had not transferred 20% of these shares to the firm. Fast forward to this case, filed by Constance in April 2010. Constance claims that during the firm's dissolution, Brennan breached the fiduciary duty to him and to the firm when he allegedly failed to disclose it in March 1997, 13 years earlier. Connors had tendered 458,000 Argosy shares. Since the firm was breaking up, Brennan had told the transfer agent to defer the transfer until it could be determined whether the stocks would go to Brennan or to the firm. Before that issue could be resolved, however, Judy Cates sued Connors in May 1997, and on July 3rd, Bruce Cook, who suddenly became Connors' attorney, terminated Brennan's contract, asserting it was void. Constance's claim is that even though he repeatedly and consistently declined any interest in the Connors' fee, it was pursued in litigation. He would have negotiated with Ed and Judy for his share, whatever that might have been, if the stock tender had been accepted in March 1997. Following a 19-day bench trial, the trial court found for the plaintiff summarily rejecting all of Brennan's affirmative defenses without explanation and entered judgment for $1,640,000. In this appeal, we have raised six issues. Four are affirmative defenses. The first three are race to decada, statute of limitations, and release. In addition, we say the trial court erred in finding that Brennan's breach of fiduciary duty as alleged and that the conduct alleged as a basis for plaintiff's claim was not a proximate cause of any harm. Any one of these is sufficient for reversal, and all have been fully agreed. I'll be happy to answer questions on any issue, but in the time available, I can only discuss a few key points. First, Brennan did not breach any fiduciary duty to Constance or to the firm. This is a story in two acts. Act one is January to June 1997. The dissolution began when Cates announced her intention to leave the firm. Her February 26 letter said effective March 1. Under the firm's stock redemption agreement and the firm's employment contract, a withdrawing shareholder or employee is entitled to take his files, quote, without lien or claim by the firm. The principles met on February 27 and March 4. And at these meetings, Brennan, with complete justification under these longstanding agreements, took the position that he was entitled to take the connoisseur's representation with him as he left the firm. This would include unpaid fees for work not yet performed, which he maintained was the balance of the connoisseur's fee due but unpaid under the contract. Brennan and Constance both testified that notes were taken at the March 4 meeting. Unfortunately, these notes are not available because, as Constance testified, he destroyed them. However, the claim is that these notes would reflect that the parties agreed to abide by the stock redemption and employment agreements. But shortly thereafter, Cates took the position that the uncollected connoisseur's fee was an account receivable and a firm asset. But what is crucial is that Brennan justifiably claimed his right to the connoisseur's contract going forward under the firm's agreements. So even if, as Constance claims, Brennan didn't tell Constance about Spivey's March 1997 tender, as a matter of law, there was no breach of fiduciary duty. When Spivey called, Brennan knew the status of the connoisseur's contract was one of the issues yet to be resolved. So he simply told Spivey to hold off the transfer until he could tell him whether to put it in his name or the firm's. This is undisputed. This is the exact opposite of a breach of fiduciary duty. Brennan never appropriated or sought to appropriate the connoisseur's fee to himself. He did only what he was legally entitled to do. He asserted his rights under the firm's agreements and his rights under the Brennan-Connors representation agreement, which obligated him to perform all of Connors' legal work going forward for as long as Connors wished, his lawyer for life. A partner's fiduciary duty requires good faith, honesty, and fair dealing. It prohibits, quote, all forms of secret dealings and self-preference in partnership matters. I quote that because plaintiff's brief cites the same standard. Brennan reached no such duty. There were no secret dealings. There was no self-preference. The Argosy stock remained with the transfer agent in Connors' name. Brennan made no effort, secret or otherwise, to obtain the Argosy stock for himself. He gained nothing, no preference, by simply telling Spivey, I'll get back to you. Although the trial court did find as a factual matter that Brennan failed to communicate Spivey's tender to Constance, this by itself does not constitute a breach of fiduciary duty, and the trial court erred in so holding. Eyesight is always 20-20. When Brennan told Spivey in March 1997 to hold off on transferring the stock, he had no idea what would happen shortly after that. He didn't know that in May, Judy Cates would file suit against both him and Jimmy Connors, resulting in Jimmy losing all interest in tendering any shares. He didn't know that on July 3rd, Bruce Cook would suddenly announce that he, not Brennan, was now Jimmy Connors' lawyer, and that he was terminating the Brennan-Connors representation agreement on the ground that it was void and unenforceable. So when Brennan deflected the Argosy stock tender in March, he had every right to believe that the tender would be ongoing and the stock would continue to be available. He never denied the firm's claim to that fee. In fact, the firm's claim was the whole reason he deferred the transfer. There was simply no breach of fiduciary duty. Act II in this drama begins with the firm meetings in June. What happened next was the coup. At a shareholder meeting on June 19, Cates and Constance removed Brennan as the director of the corporation. Now Cates and Constance could and did meet as directors without Brennan and could act without regard to Brennan's claim to the Connors' fee under the firm, stock, redemption, and employment agreements. At a special board meeting two days later, Brennan was removed as president, Cates was elected president, and Constance continued as vice president, secretary, and treasurer. Next came Bruce Cook's July 3 termination letter. Now Brennan had no further obligation to Connors under the contract. The stock was no longer available. So the issue became, was the Connors' fee claim a firm asset? Was there a claim against Connors under the contract or for quantum error? If so, whose claim was it? Cates had filed a three-count lawsuit in March 19. Count 1 is not relevant here and was dismissed in July. Count 2 was a shareholder derivative action by Cates, in her capacity as a shareholder of the firm, against Brennan individually, alleging that he briefed his fiduciary duty to the firm with respect to the Connors' representation and fee. Count 3 was by Cates in her capacity as a shareholder against Jimmy Connors, and Count 3 was dismissed with prejudice to be refiled the following year. This is the 97-L case. At the June 21 board meeting, Constance and Cates voted for BCC, the firm, to retain Armstrong Teasdale, to take over the case against Brennan, and to collect all fees and accounts through the firm, including the Connors' fee. The first element of race judicata is identity or privity between the parties in case 1 and case 2. Corporations and their officers, directors, and shareholders are classic relationships that establish privity. Where a closely held corporation is a party to litigation, those stockholders who are in control of the corporation are in control of the litigation, and they are bound by the decision in that case. In this case, the firm was a party to Cates' suit against Brennan as a matter of law, litigation that Constance specifically authorized. In addition, Count 2 was a shareholder derivative action, which by definition is on behalf of the corporation. Constance was an officer, director, and shareholder, and so he is in privity with Cates and the firm. In addition, Constance is in privity because he knowingly, willingly, and fully participated in the prosecution and settlement of 97-L. He actively participated in the settlement discussions and in the release. He authorized the settlement of all claims. The release recites that the individually named shareholders may have claims and or causes of action against one another or against the corporation, and that they desire to resolve all their disputes over the assets and liabilities of the corporation. The individual shareholders desire to compromise and settle all their conflicting claims and assertions in the lawsuits and otherwise. Cates' lawsuit against Brennan is specifically covered. Constance bargained for and received consideration for that settlement, including a whole-house agreement with Brennan and Cates, a favorable settlement of his fees and expenses, and the right to walk away from the firm free and clear. What is the interplay between the signing of this release that releases everybody in the firm from all claims known and unknown? What's the interplay between that and the claim of fraudulent concealment? Your Honor, the interplay is that that release is a binding contract in which he released his cause of action. And so whether there was any, of course, we say that as time went on, after June and July of 1997, whether there was any fraudulent or any concealment, we say it was not a fraudulent concealment, but any concealment of that tender became irrelevant. That's not relevant to the release issue. And that's my question. I mean, does a claim survive under the theory of fraudulent concealment once you've released all claims known or unknown? No, it simply does not, Your Honor. In other words, that's our release point. In March 1998, Constance released this cause of action. He's bound by that release. The release is in our appendix at page 39. It was part of the global settlement of all issues in the case, and the whole purpose of it was to release all claims against Brennan for any breach of fiduciary duty. That's specified in the release, and it's clear to all of the record in this case that that was the purpose of it. He releases all claims known and unknown arising out of their participation in the firm. So the whole purpose of the release was to protect against someone coming along later and filing a new lawsuit like this one. If he wanted to file this lawsuit, he would have had to have gone in and asked to have this release set aside. He never did that. That's not any of the claims in this case. The claim is simply for breach of fiduciary duty. So for all these reasons, I mean, we have the race-judicata affirmative defense as well, which we think is conclusive. Because he was in frivolity with the firm and with Cates in their lawsuit against Brennan, the 97L case, that case was resolved. It's the same cause of action under the Illinois Supreme Court authority. And a voluntary dismissal with prejudice order entered by the court is a final judgment. So all the requirements of race-judicata are conclusively established under the undisputed facts. Statute of limitations. The statute of limitations for this claim, breach of fiduciary duty, is five years. This suit was filed in April 2010. The predicate acts alleged in Plaintiff's complaint occurred in the first half of 1997. And by Constance's own admission, there was no fiduciary relationship after March 1998. To avoid the bar of the statute, Plaintiff has to rely on the fraudulent concealment statute. Under that statute, Plaintiff has to show that he could not, by ordinary care, have discovered the concealed information. The information allegedly concealed was that Spivey attended the counterstock to Brennan in March 1997. In his brief, Plaintiff states, quote, Constance was not informed of counterstock tender until late 2009, just prior to the settlement. Close quote. To put it politely, this is completely contrary to the rest. The evidence in this case shows unequivocally, by Constance's own admissions, that he not only had constructive but actual knowledge of the facts he claims were concealed, and he had this information no later than 1994, January, February, and again in the summer, more than five years prior to filing this lawsuit. Did you mean 2004? 2004, yes. I thought you said 1994. I'm sorry. 2000, I'm sorry. I did miss the speech there. I apologize there. 2004. Is there any dispute about that, the fact that he had this Spivey deposition late 2003? No, we have detailed this in pages 50 and 53 of our brief. We've cited every part of the record, and these are Constance's own admissions. There's no contradictory evidence on that? There's no contradictory evidence. Well, he says his only explanation in the record is that, well, I didn't really understand. But that's contradicted by his own admissions in the record. He testified that for sure he read Spivey's deposition in January or February 2004. In his deposition, he was asked specifically whether the Spivey deposition would suggest that your former partner, Ed Venn, was trying to cheat you out of the shares of stock, and Constance answered, I certainly was concerned. Question, that's the question that was raised by Spivey's deposition, correct? Answer, yes, I would say it did. This is all evidence that was introduced, exhibits and evidence that was introduced. Constance was asked why he thought Quaydoe provided him with a Spivey deposition. Question, you said you suspected it was to pique your interest, right, because the deposition suggested that the stock had been tendered or made available and that Venn had turned it down. Answer, right. He may have wanted me to get in the suit. Also, when presented with a copy of Randy Buller's affidavit, Constance testified he assumes he told Buller around July 2004 that Chris Quaydoe provided him with a copy of the Spivey transcript and that he, Constance, told Buller that he was therefore aware that Connors had tendered the stock to Venn. In another deposition and evidence of this case, Constance, being questioned by Chris Quaydoe, testified he was not aware that Connors had tendered the shares to Brennan in 1997, quote, until you sent me Tim Spivey's deposition. Quote, seeing Spivey's deposition, I quickly realized what was going on in January of 1997. When he saw the deposition, which he admits he saw in January or February of 1994, he read it, I knew exactly what happened and why Judy and I weren't included. The question, why is that? Answer, because everything was humpy-dory until Judy said she was leaving the firm, and I presume that is why Ed didn't go ahead and have the stock power executed and have the shares brought into the firm. At trial, Constance affirmed this testimony, and we've cited all the page references to the record, to the transcript, where he did. He testified that when he read Spivey's depo, quote, I smelled a rat. At trial, he testified the question to him was, it's crystal clear from the Spivey deposition that there was an offer of the shares to Ed Brennan in the beginning of 1997, right? Answer, yes. Question, and it's crystal clear from the Spivey deposition that Mr. Brennan did not accept that offer of the shares, correct? Answer, yes. So he did answer, yes, crystal clear. So Constance was fully aware of the tender in January, February, and the summer of 2004, but he testified he made no further effort to investigate these facts. He waited until after the Brennan-Connors case was settled to file this lawsuit. We've cited numerous cases that say a party claiming the benefit, even if there's a fiduciary relationship, which there wasn't by that time, but even if there were, a party cannot show his eyes to obvious facts and fail to seek information that is readily accessible and then charges ignorance to others. That's McIntosh v. Guado decision of this court. All the essential elements of the claim of our defenses, rather, have been established conclusively, and for these and all the other reasons detailed in our briefs, the judgment must be reversed and the cause dismissed. Thank you. Thank you. Thank you. May I please report? My name is Bruce Cook. I represent the plaintiff, Michael Constance, in this matter, and I brought my phone up, and I think I've turned it off. You've taken the clock down. Oh, my goodness. It's very troubling for us, too. I apologize, but I haven't quite. I've only had this for five years. I haven't quite mastered it, but I believe it's off, but then I can tell it in time. It's ancient by now. You know, the last time I was here, I don't believe any of this panel. No, no, I think Justice Foner was here. I said I thought that that would be my last time, but it obviously wasn't, so I'm not going to say that again, and I guess I don't know when it's the last time, and perhaps that you can remember. I would like to differ with a couple things, factually, that Professor Kanalka has argued that was contained in his reply brief that we didn't get a chance to respond to, and he repeated it in his argument this morning. He says on page 15 of his reply brief, it is undisputed that the Brennan-Connor contract was canceled July 3, 1997, and that everybody knew the stock was never offered or shown to be available after that date. He neglected to put a record citation in because that is not quite the case. I was called to testify, and I did testify that the stock was available because Jimmy Connor, it wasn't attorney-client information. Jimmy Connors had more than 2 million shares of stock. The subject of this was 450, 5,333 shares. In any event, they rely on my letter when I was representing Mr. Connors that I wrote on July 3rd, and it says, Dear Bob, to Bob Becker, my dear friend who was deceased and who was representing Mr. Brennan at the time, this letter is to confirm our conversation that I have advised Jimmy Connors that his contract with Brennan, Tate, and Constance is void, and is also void for several reasons, not the least of which is Judy's rather clear violation of the firm's fiduciary duty to Mr. Connors. And I said, in any event, we want to declare the contract as terminated, that the day before, there is a record that was entered into the evidence in the case that was marked both Plaintiff's Exhibit 11A, Constance, and Defendant's Exhibit 3A, and is a memorandum made on the day before, 7-2, of a discussion that Mr. Becker apparently had with me. And I'll quote a portion of it. He said, Bruce said, Ed shouldn't worry, should not worry. Connors has no problem with him, just something or other. But in any event, if you look at the record, you will be able to see that at least at that point in time, Mr. Brennan and Mr. Connors were, and had been, good friends. You can see by the letters, if you care to look at them in the fall, in any event. Excuse me, Mr. Cook, are you saying that there was another tender of the stock? Are you saying there was another tender of the stock after July 3rd, 1997? What I was saying was that he said that it was never offered or shown to be available. I don't think it was. There was no evidence until the fall that you could conclude that Mr. Connors had no longer intended to give to Mr. Brennan the 455,000 shares of stock. And that's part of the problem that occurred here. As you know from reading briefs, is that there was a contract entered in on Brennan-Case-Consol stationary between Jimmy Connors and Mr. Brennan, where the firm was to get 20% of the value of the stock that he received. Not stock, it says value, and that has some relevance here. In any event, when the Argosy went public and Connors received stock, quite a bit of it, more than 2 million shares of stock, and the IPO value was $19 a share, and Connors, the record is clear, attempted to give to Brennan-Case-Consol the 20%, and was going to transfer it, and then he was informed by Argosy, apparently, that to do that would violate SEC Rule 144, and so that he was only able to sell a little more than $3 million worth of the stock. That stock, 20% of it, was sent on to Brennan-Case-Consol, put in their accounts receivable, or their trust account, however they did, and was distributed equal to Mr. Case, Mr. Consol, and Mr. Brent, more than $250,000 apiece. In any event, that when the time ran, the couple years that was prohibited, is that Mr. Brennan and the firm asked Mr. Connors to transfer the stock, and because Mr. Connors had a zero basis in the stock, that they were reluctant to transfer it, because they would have a huge tax hit on the stock. The firm agreed, because they knew that the value of the stock, they knew two things about the stock, because Mr. Brennan was Jimmy Connors' nominee on the board. The stock was going to go down, and then it was going to come back up, which both of those things occurred. In any event, they agreed to accept the stock at that point in time, in lieu of money, after the stock had gone down, and at least according to the record, on July the 26th, Mr. Becker wrote a letter, I believe it's Mark Plaintiff's Exhibit 11, saying that Miss Case wrote and said she was leaving the firm, and that very day, according to Becker's letter, his lawyer, Connors, that the stock had gotten down to about three or four dollars a share, and Connors' accountant called Mr. Brennan and told Mr. Brennan that they were going to transfer the stock. Actually, it was not the accountant, it was Tim Spivey, his banker broker. And Mr. Brennan, according to Mr. Brennan and Mr. Spivey, told him, no, don't do it, that I don't know what name to put it in, and I'll get back to you about what name to put it in, and Mr. Brennan never did get back to them. And in that, a nasty negotiation on a lot of things, including the value of the Connors' stock, took place as Miss Case was leaving the firm. And although Mr. Brennan testified that he no longer had a fiduciary duty to Miss Case or Mr. Constance after the firm was in dissolution, Constance testified that the firm continued to practice together for several months after that date, and if you look at plaintiffs' exhibit number 34 and 34A, which were recovered from Miss Case's file, who is a very careful notetaker and also appears to be rather skeptical and cynical about it, much more so than my client, Mr. Constance. But in any event, those two documents, 34A and 34, which were found in the middle of the trial, are letters from Brennan to Miss Constance, and they say, Dear Judy, once again, this is 34A, April 8th, Once again, you misstate the purpose of our meeting. Brennan, Case, and Constance is not a corporation in dissolution. Now, at that point in time, of course, he's the president of the corporation. He has a fiduciary duty to Judy and to Mike, and I apologize for using first names. I've known all of these people for 40 years, and I will try and remember to use their last names. He had fiduciary duty to them. He also wrote when we recovered, oh, and the stationery says Brennan and Constance on it, confirming what Constance said. It said on April 21st, the corporation previously known as Brennan, Case, and Constance is not in dissolution, but is in reorganization. Now, she was entitled to participate in the assets of that firm. And he admits that he didn't tell her about the offer of the stock. This is an asset that was worth several million dollars in time, and if held, would have been worth $21 million at the time of the settlement because of the price of the stock went way up. He didn't tell her, but he says he did tell Mike Constance. And Mike denied that, that he told them. And one of them, both of them have said it under oath. One of them is not telling, was not telling the truth under oath. And in any event, the fight was going on. Mr. Weil said like cats and dogs between Miss Case and Mr. Brennan, and the main portion of the fight was about Conner's fate. Mike, at that period of time, was embarrassed by the fight, and in any event, Miss Case filed suit on May 17th of 1997 against, and that's the suit that they claimed for claim of reclusion, filed suit against the firm, Mr. Brennan and Mr. Conner, and she sued Mr. Conner for $8,300,000 for a stock that if they accepted the 20%, that was worth a little less than $2 million. And Mr. Conner at one of the exhibits got his, you know, I don't have to tell you about his celebrity, but he got his picture all over the front page of the paper. Miss Case, of course, would not have done that, had she known that this man had made a tender in satisfaction in keeping with their agreement. And, of course, Brennan admits that he didn't tell. He admits he didn't, well, he kind of admits that he didn't tell his own lawyer, Don Weil, because he answered an enrollment for him under oath that said, yes, he did tell him. Weil denied that he told him that the tender had been made, and Weil was his expert witness in the case. And Weil, also offered as an expert witness, said that during the summer of 1997, Brennan had a fiducial duty to tell Case and Constance of the offer of the stock. Mr. Cook, excuse me, but assuming that all to be true, didn't your client know in 2003 or 2004, or strongly suspect that he was being cheated out of the stock? Well, you're getting into the statute of limitations, aren't you? Well, I think they're all kind of intertwined. In 2004, I believe that he was informed of the deposition of Spivey, and he said that he had something going on and he didn't even look at it. He was not overly concerned about this. He had every reason to believe his old friend. Well, I think what's quoted here is that he agreed that he thought Ed Brennan was trying to cheat him out of the shares of stock. Right. And what he did was, when he became aware of that, he went over to see Brennan. And he said Brennan told him that it was not true, that that did not occur. And Brennan admitted in his testimony that the discussions were similar to the letter that he wrote him on December the 29th, where Brennan stated that I did nothing to dissuade Jimmy Connors from playing his obligation to the firm. That was not true. We would take the position, Judge, that there are three reasons, each of which are valid, why statute of limitations did not expire. First, that there's no question about the justification for the equitable espionage. I don't think, under the, that Mr. Brennan relies, good way to plumb people, that if you take the equitable stock out of play, I mean, take the agreement of March the 28th, 1998, out of play, what exists? What exists is a lawsuit that Mr. Brennan has been authorized to file for the corporation, and it was authorized before it was filed, for the corporation Brennan, Cates, and Constance. Michael Constance owns one-third of that corporation. He owned it in 2003, 2004, he owned it in 2009. What does Mr. Constance, and indeed Judge Gleason said in an argument, he said, where's the grace? What does Constance get? Judy Cates wasn't a party to this lawsuit. She wasn't a party to this lawsuit. She recovered because of the settlement with Brennan, Cates, and Constance. The only damage to my corporation, when there was something that was produced by the lawsuit, and he, if you don't, if the agreement of March the 28th is enforceable, then Mr. Constance loses. If the agreement of March the 28th is not enforceable because of misconduct, then he wins. Additionally, Mr. Brennan, throughout this lawsuit, representing Brennan, Cates, and Constance, had a fiducial duty that, despite what Mike says, that continued to the members and owners of that firm, Brennan, Cates, and Constance. Constance was owed a full disclosure by Brennan. He went to Brennan. And Brennan flogged him again. And you might say that there should be, well, you know, you shouldn't believe him twice. Well, but I guess if you say that, then you will be substituting your judgment for Judge Gleason. Let me ask a quick question about the release. What does it mean for Constance to sign a release during a time when there's a lawsuit on file against Brennan for breach of fiduciary duty having to do with the Connors contract, to sign a release that says I release all claims known or unknown? Well, there has to be an identity of the parties. Ms. Cates said she didn't release him, but the judge said, Judge Stewart, that that's not enforceable because of the equitable estoppel. He has stopped that release. If that release is enforceable, you're quite correct. But the judge's order, folks aren't supposed to profit from a breach of their fiduciary duty and their duty to be honest to their courtrooms. And the evidence well supports the judgment of Judge Gleason. Thank you very much. Counsel. I'd like to briefly talk about this overriding equitable estoppel argument that the plaintiff has made throughout this case, which he says trumps all affirmative defenses. It trumps the release. It wipes out everything. This is just smoke and mirrors, Your Honor. There is no such rule of law. If there were, plaintiffs could always defeat every defense, every release, every statute of limitations, every race-based counterclaim simply by claiming that this is about a breach of fiduciary duty. We have addressed all this in our reply brief. There is no such law. Talking first about his point that he says we're not correct to say that the stock was not available in the summer and fall of 1997 because Bruce Cook testified that it was. Well, there's no corroboration for that. And he took the position that the contract is void. If the contract is void, it's void ab initio, and therefore you can't bring a claim under the contract for the stock. How is the stock available if the contract is void? Moreover, if the stock were available, why didn't Congress tender it right away? At that point, the stock was only worth $2,000 or $3,000 a share. That's the interesting thing about this case. It was worth a million-something at that point in time, the 458,000 shares. So he wound up settling this case for $10.5 million, setting the fee claim against him. He could have settled it for $1 million simply by giving them the stock in 97 or 98, which suggests very powerfully that the stock was not indeed available. Otherwise, he would have tendered it. And as was brought out, there never was a tender. Moreover, the lawsuit which was pending at that time, the 97 Hill case, the ad amnum was $8 million. And Armstrong Teasdale had made a demand for $8 million. Why didn't he just tender that $1 million worth of stock? The plaintiff says that there was this fiduciary duty, that there was a dispute about whether there was a fiduciary duty. And it's true that during the initial part of the negotiations, there were various claims made with respect to the fiduciary duty. But we're not claiming that there was. We have the law in our brief which says that the fiduciary duty ends when the firm dissolves. The firm dissolves when one of the shareholders withdraws. So that's the beginning of the dissolution. The only fiduciary duty after that point is in the winding up process. So there is a fiduciary duty during the winding up process. But that fiduciary duty does not prevent the parties from bargaining at arm's length. And we cited law on that. And that's exactly what happened in this case. In any event, by Constance's own admission, there was no fiduciary duty after March 1998. So whatever fiduciary duty existed during the winding up process, that's when it ended. So anything that happened after that date cannot be predicated on any kind of fiduciary duty. Constance says he went to see Brennan after he read the slide. Of course, it's interesting he waited over a year to go see Brennan after he read the Spivey deposition. But he says he went to see Brennan and Brennan reassured him there was no tender. Well, assuming that's true, so what? There was no fiduciary duty at that point for Brennan to inform Constance of anything. Moreover, Constance had already decided. He already had plenty of information that there was a tender. How could he rely on a statement by Ed Brennan that there was no tender when he had independent evidence from multiple sources that there was a tender? There was documentation. Bruce Cook knew there was a tender. In fact, Randy Woolard says everybody knew about the tender. So it's not reasonable diligence for him to fail to follow up and investigate and not rely. If there was such a statement on Ed Brennan's statement that there was no tender. He says there was discussion about the firm not being in dissolution. And I think Ed and Brennan and Mike Constance thought that was the case. They tried to continue. But that ended in April. In April, they decided to go their separate ways. From that point on, all parties agreed that we were in the dissolution process. Thank you, Counsel. Thank you, Your Honor. That was it. Okay, we'll take a five-minute recess. All rise.